UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: _11-4-2010_

-------------------------------------------------------x

JOAN OCHEI,

      Plaintiff,

  -against-

**THE COUNTY OF NEW YORK;**
**BRENDAN KALKAU**, Individually and in his official
capacity as Police Office for the City of New York;
**"JANE DOE" MARTIN**, Individually and in her official
capacity as Police Office for the City of New York;
**"JOHN DOE 1"**, Individually and in his official capacity
as Police Office for the City of New York;
**"JOHN DOE 2"**, Individually and in his official capacity
as Police Office for the City of New York;
**ERIN CHOI**, Individually and in his official capacity as
Assistant District Attorney for the County of New York;

  -and-

**317 WEST 45th STREET, NEW YORK, NY, 10036**, d/b/a
**317 ALADDIN HOTEL CORP.;** d/b/a
**ALLADIN HOTEL LONGACRE. LLC;**
**ALAN LAPES**, Individually and as Owner and Managing
Agent of 317 West 45th Street, New York, NY, 10036;
**HARRY MULAKOFF;** a/k/a
**HARRY MALAKOFF** In his official capacity as Receiver
of 317 West 45th Street, New York, NY, 10036;
**ANGELA SAIDANA**, Individually and in her official
capacity as employee and managing agent of 317 West 45th
Street, New York, NY, 10036.

      Defendants.

-------------------------------------------------------x

10 Civ.3718 (AKH)
10 Civ.3719 (AKH)
(Consolidated Cases)


**AMENDED COMPLAINT**


**PLAINTIFF DEMANDS
A TRIAL BY JURY**

**PRO SE OFFICE**

   Plaintiff, Joan Ochei ("Ochei" or "Plaintiff"), proceeding *pro se,* files her Amended

Complaint and claim against the parties listed in the above entitled consolidated actions,

collectively referred to herein as defendants, alleges and states as follows:

   Plaintiff originally filed two separate *pro se* Complaints on April 2, 2010 against two

separate group of defendants which includes the New York City Police Department, the City of

New York ("City") and the individuals employed by the City and County of New York ("County"), as well as her landlord 317 West 45 Street, New York, NY, 10036, and the individual owner, employees and/or agents of her landlord. Plaintiff's initial filing process consisted of submission of her original Complaints, applications for in *Forma Pauperis* and Request for Appointment of Counsel.  While filing her complaints, plaintiff contemporaneously requested that the two cases be consolidated.  By Order of Honorable Loretta A. Preska, Chief Judge, dated May 5, 2010, and entered on May 5, 2010, docket entry #4, entitled DEMAND TO CONSOLIDATE and docket entry #5, entitled ORDER OF PARTIAL DISMISSAL, the Court granted the request to consolidate the two cases and directs the Clerk of the Court to assign docket numbers to each complaint and to dismiss the action as to defendants Raymond W. Kelly, Robert M. Morgenthau, and Hon. J. Burke. The Court also directs the Clerk of Court to issue summons under the lower of the two docket numbers in this action omitting Raymond W. Kelly, Robert M. Morgenthau, and Hon. J. Burke as defendants and further directs that the Clerk reassign this case to a district judge in accordance with the procedures of the Clerk's Office.  The Court directs that this case proceed under only the lower of the two docket numbers in this action and that the Clerk close the complaint under the higher of the two docket numbers.

Pursuant to the Partial Order of the Court, plaintiff did not serve her summons and complaints upon the individual defendants omitted from this action by this Order.  Although plaintiff had originally planned to appeal this Order, she was advised however, that she could still appeal this Order at the conclusion and final disposition of this action at the district court.

On July 21, 2010, plaintiff served her Correction of Errors in Plaintiff's Interrogatories to Discover Identities and Addresses of Defendants Dated 7/6/2010 upon counsels and upon her landlord Alan Lapes, c/o Aladdin Hotel Corp.  On August 27, 2010, and September 17, 2010,

counsels for the City and County defendants filed their respective motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), docket entries #13 and #19. On September 17, 2010, the Hon. Alvin K. Hellerstein, United States District Judge, by an Order dated September 17, 2010, denied these motions, and further dismissed the New York City Police Department and the City of New York as defendants, docket entry #18

Pursuant to this Court order plaintiff files a motion for reconsideration or, in the alternative, plaintiff request that the Court certify her standing question for immediate interlocutory appeal under 28 U.S.C §1292 (a)(1). Plaintiff also includes two additional defendants, "John Doe" 2 and County of New York. The additional defendants and this amendment to the original complaint seek to bring clarity to plaintiff's filing in accordance with Rules 8 and 10 of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.")

Fed.R.Civ.P. Rule 15(a)(1)(B) instructs that "[a] party may amend its pleading once as a matter of course within: 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Defendants 317 West 45th Street and its owner, agents and/or employees (the "Landlord Defendants"); and "John Doe" have not entered an appearance, or serve their responsive pleadings to plaintiff's Complaint. Also, both the City of New York and its individual employees, and the assistant district attorney have not served their responsive pleadings. As such, plaintiff's filing of an Amended Complaint without seeking leave of the Court to do so is proper."

Pursuant to the Court order entered on July 8, 2010, which requires plaintiff to reformulate the caption to eliminate the parties who have been dismissed by Chief Judge Preska and by the Court Order Dated September 17, 2010, plaintiff will amend the caption to exclude the parties listed in these order and to further add the two new defendants to the list of defendants on the caption.

## NATURE OF THE ACTION

1.     On the morning of May 14, 2008, at the lobby of the privately owned residential premise located at 317 West 45th Street, New York, New York, 10036, the plaintiff, a tenant was arrested by New York Police Officer Brendan Kalkau ("Officer Kalkau") shield 10287 of the 018 Precinct-Midtown North Precinct.

2.     Following the arrest which happened at approximately 8:37 am, plaintiff was handcuffed, escorted to a police patrol car, and was kept in custody of Officer Kalkau's partner inside the patrol car as Officer Kalkau returned to plaintiff's room, supposedly to return plaintiff's personal belongings which were seized from the plaintiff together with the keys to her room, by Officer Kalkau.  When Officer Kalkau returned to the patrol car, plaintiff was transported to the 18 precinct in handcuff by Officer Kalkau and his partner.

3.     At the police precinct, plaintiff was body-searched at a public area of the lobby by Officer "Jane Doe" Martin ("Officer Martin") shield 27702 and was detained, first at the 18 precinct for approximately 4-6 hours before being transported in handcuff to 100 Center Street, New York, NY, 10013, where plaintiff remained for additional 20-25 hours before being arraigned on May 15, 2008.

4.     This action, arising from that incident, was filed under 42 U.S.C. §§ 1981, 1982 and 1983 and the Fair Housing Act, 42 U.S.C. §§3601 *et seq*.  The action is also for personal injuries and violation of United States and New York State Constitutional and Statutory rights from false arrest and imprisonment, detention and confinement, unreasonable search and seizure, invasion of privacy, conspiracy, refusing or neglecting to prevent, violation of the civil rights act, equal protection of the law and due process, violation of §§3601 *et seq*. and the Fair Housing §§ 1981 and 1982, violation of the New York State Human Rights Law, the Executive Code §§ 290 *et seq*. and

the New York City Human Rights Law, the Administrative Code §§ 8-101 *et seq.* defamation, malicious abuse of process, malicious prosecution, assault, battery, negligent supervision, negligent, negligent infliction of bodily harm and emotional distress, intentional infliction of bodily harm and emotional distress.

5.     On the day of this incident, while on her way to the New York State Department of Labor office, claimant stopped inside the management office of the premise located at 317 West 45th Street, New York, NY, 10036, which was the room nearest to the exit door from the lobby, sometime after 8:00 am, to make a service request for hot water and for repair of a leaking faucet inside the fourth floor community bathroom.

6.     Plaintiff was asked by the landlord's agent, Angela Saidana who was sitting next to a man to state how long these services had been cut off.

7.     Plaintiff answered this question in a respectful manner by informing Angela Saidana that the hot water had been turned off for over three weeks, and the faucet had been leaking water for more than one year.

8.     To plaintiff's surprise Angela Saidana responded with a derogatory remark by stating, "get out of here, you are crazy".

9.     Plaintiff attempted to address this unprovoked insult by demanding an explanation for this derogatory remark.

10.     Angela Saidana responded again by jumping up from her seat, approached plaintiff at the door, and ordered plaintiff to step out of the doorway, while holding on to the door as though she was going to slam it.

11.     With Angela Saidana standing close to her at the doorway, plaintiff repeated her demand for an explanation for Angela Saidana's remark, whereupon Angela Saidana slammed the door in an effort to shut it, and the door hit the plaintiff.

12.    In reaction to this, plaintiff decided to call 911 for police assistance.

13.    While her attention was focused on her cell phone as she attempted to call 911, Angela Saidana pushed plaintiff and she fell to the ground next to the security desk at the lobby, and apparently sustained a bump on her forehead.

14.    Due to the traumatic impact of this attack and the fall to the ground, plaintiff did not feel the impact of her injury.

15.    However, plaintiff received immediate assistance from two individuals who witnessed the fall, and observed the bump on plaintiff's forehead.

16.    These two individuals who were social service workers, employed by the Department of Homeless Services using part of the premise as a homeless shelter, encouraged plaintiff to call 911 for emergency medical services ("EMS"), and escorted her to their office which was located at the back of the lobby, behind two separate doorways, sometime between 8:00 am and 8:30 am, after plaintiff had placed 911 call for EMS.

17.    Plaintiff was seated inside one of the social service office after crossing a third doorway, waiting for EMS arrival, and anticipating having to travel downtown to the Department of Labor office where she was scheduled to attend one of a few lecture series relating to unemployment and job search with the bump on her forehead.

18.    Officer Kalkau approached plaintiff inside the Social Service office and began questioning Ochei before the EMS arrived at the scene.

19.    Whether characterized as a "right" or "privilege," a person cannot be deprived of liberty or possessory rights for arbitrary reasons or in a manner that offends the Due Process or Equal Protection Clause of the Fourteenth Amendment of the United State Constitution. A State cannot aid and abet a landlord in acts or omissions that substantially interfere with or disturb the

comfort, peace or quiet of a person in a manner or for a reason that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment. Arbitrary, subjective and politically motivated arrests, prosecutions, or evictions are unlawful. A claim of liberty or possessory right to a dwelling unit in a State and deprivation of that right is a controversy. Moreover, the requirements of due process must be met before a State or a landlord can deprive a person of liberty or evict a person from a dwelling unit.

20.    Plaintiff brings the action alleging that the State of New York aided and abetted her landlord in its unlawful eviction practice and have engaged in constitutionally invidious discrimination by inappropriately offering plaintiff a plea bargain compelling plaintiff to explicitly and implicitly plead guilty to a misdemeanor as a condition for dismissing a criminal charge of third degree assault against the plaintiff.

21.    Plaintiff's refusal to plead guilty to a lesser misdemeanor charge of violation resulted in plaintiff having to make several court appearances of up to eight times between May 15, 2008 and November 16, 2009, before the Court finally dismissed the charge against her.

22.    While the ultimate goal of the defendants – to give criminal defendants the opportunity to avoid sitting through a trial risking conviction on the original more serious charge is certainly lawful, the means used by the defendants to achieve that goal is not.

23.    The defendants' policy applicable to all criminal defendants offering lesser charge of misdemeanor for a speedy dismissal of charges against them, and requiring each person charged with misdemeanor to plead guilty to a violation as a condition for dismissing charges against them is certainly unlawful.

24.    Despite plaintiff's contemporaneous oral motion for a grand jury investigation of her case and for self representation on May 19, 2009, plaintiff was represented on September 10, 2009 by the Court appointed public defender counsel whom Ochei had specifically requested the Court to

relieve from her case.

25.    Defendants' unlawful, arbitrary and capricious targeting of the plaintiff for punishment based strictly on her refusal to affirmatively plead guilty to a misdemeanor is separate and apart from plaintiff's good moral character, and her conduct on the day of her arrest that would otherwise permit plaintiff to a speedy trial and/or a speedy dismissal of charge against her.

26.    After her second Court appointed counsel refused to address her concerns regarding the late hour investigation of her case which had already been investigated by The Legal Aid Society, and also following her dissatisfaction with the Court's decision to assign this new counsel on her case more than six months after her arrest and without reasonable cause, on May 19, 2009, Ochei made an oral motion for grand jury investigation of her case and for the Court to relieve her counsel, but the Court either denied or ignored plaintiff's motion.

27.    The allegations below leave no doubt that it is the defendants' intention to impose a grave constitutional injury upon plaintiff for plaintiff's refusal to affirmatively plead guilty to a misdemeanor as a condition for dismissal of the misdemeanor charge of third degree assault against plaintiff.

28.    Defendants have arbitrarily and capriciously deprived plaintiff of her constitutionally protected right to a fundamentally fair prosecution.

29.    Defendants' disguised mechanism to evict tenants without due process has the discriminatory impact of persecuting and oppressing plaintiff's quiet and peaceful possession of her dwelling unit, which is protected by the Fifth Amendment of the United States Constitution.

30.    Defendants' conduct in compelling plaintiff to make several court appearances while repeatedly issuing her temporary restraining order at each court appearance and ordering her to stay away from her accuser is tantamount to covert boycott and deprivation of plaintiff's possessory

rights in violation of plaintiff's Fifth Amendment rights guaranteed by the United States Constitution.

31.    Defendants' denial of a legitimate claim of entitlement to a protectable property and liberty interest is in violation of the Fourth and Fifth Amendments' Due Process Clause of the United States Constitution.

32.    Defendants' denial of plaintiff's protectable property and liberty interest is a violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

33.    Defendants' denial of plaintiff's Equal Protection of the law is a violation of the Fourteenth Amendment of the United States Constitution.

34.    Plaintiff seeks to recover damages caused to the plaintiff by the defendants' violation of rights under federal, state, county, city and common laws.

35.    Plaintiff brings this action pursuant to §§ 1981, 1982, 1983 of the Civil Rights Act 42 U.S.C. of §§ 1981. 1982, and 1983, the Fair Housing Law, and related New York State and City law, the Fourth Amendment, the Fifth Amendment, the Sixth Amendment, the Fourteenth Amendments, New York State Constitution, the Bill of Rights and the Common Law Statute.

36.    Plaintiff seeks declaratory and injunctive reliefs having asserted facts sufficient to establish irreparable harm.

37.    If no injunction issues, plaintiff will continue to be subjected to deprivation of her liberty and possessory rights without just compensation or due process in violation of the Fourth, Fifth and Fourteenth Amendment as a result of the defendants' unlawful arbitrary and capricious targeting of the plaintiff.

38.    The injunction plaintiff seeks will not harm defendants because the conduct of unlawful eviction sought to be enjoined is necessary for the defendants to ensure lawful practice

of maintaining safe habitable dwelling units for tenants without unreasonable interference with their comfort peace and quiet.

39.    Finally, granting the injunction serves the public interest by upholding important constitutional rights contained in the United States and the New York States Constitutions.

## JURISDICTION AND VENUE

40.    The Court has jurisdiction over plaintiff's Sections 1981, 1982, 1983, 1985, 1986 and 1988 under 28 U.S.C §§ 1331 and 1343, 28 U.S.C § 2201, 42 U.S.C §§ 3613,  .

41.    The Court has supplemental jurisdiction over plaintiff's State, County and City claims, and Fair Housing Law claims pursuant to 28 U.S.C. § 1367.

42.    The jurisdiction of this Court is proper under 28 U.S.C 1332(a)(2) because the defendants are citizens of a state and the plaintiff is a citizen of a foreign state and the amount in controversy exceeds $75, 000 exclusive of interest and other costs.

43.    Venue is proper in this district pursuant to 28 U.S.C. §1391 because the properties that are the subject of this action are situated in this district.  As each defendant is a resident of and/or maintains a permanent business office in this district and the Southern District of New York is the district where a substantial part of the events giving rise to the claim occurred, venue is proper within this district pursuant to 28 U.S.C. §1391.

44.    Pursuant to §8-502(c) of the City Law, prior to filing the Amended Complaint, plaintiff will serve a copy of the Complaint on City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

## PARTIES

45.    Plaintiff, Joan Ochei whose postal address is P.O. Box 1399, Madison Square Station New York, NY, 10159, is a black female born in Nigeria and has been residing in New York since

April 1983. At the time of the events relevant to the allegations in this amended complaint, plaintiff was and continues to be a tenant lawfully entitled to possession of the apartment/room at 317 West 45th Street, Apt 420, New York, New York, 10036. Claimant has been residing at 317 West 45th Street since March 1988.

46.     Defendant 317 West 45th Street, New York, NY, 10036 ("317 West 45th Str"), d/b/a Alladin Hotel Longacre, LLC, and also d/b/a 317 Aladdin Hotel Corp. is a residential real estate corporation that owns property located at 317 West 45th Street, New York, NY, 10036. Defendant 317 West 45th Str is listed as a corporation under New York City Housing Preservation and Development ("HPD") Building Registration Summary Report with a principal place of business at 317 West 45th Street, Apt 100, New York, New York, 10036.

47.     Defendant Alladin Hotel Longacre, LLC ("Alladin/Londacre") is a domestic limited liability company and active and in good standing in the State of New York, and operating a residential real estate business in New York. On information and belief, and at all relevant times herein, defendant Alladin Hotel Longacre, LLC is also doing business as 317 Aladdin Hotel Corp. with a principal place of business at 317 West 45th Street New York, New York, 10036.

48.     Defendant 317 Aladdin Hotel Corp. ("317 Aladdin") is a domestic corporation active and in good standing in the State of New York, and operating a residential real estate business in New York. On information and belief, and at all relevant times herein, defendant 317 Aladdin Hotel Corp. is also doing business as Alladin Hotel Longacre, LLC with a principal place of business at 230 West 54th Street, New York, New York, 10019.

49.     Defendant, Alan Lapes ("Mr. Lapes") is the owner, and managing agent of 317 West 45th Street, New York, NY, 10036, d/b/a Alladin Hotel Longacre, LLC, and also d/b/a 317 Aladdin Hotel Corp. with a principal place of business at 317 West 45th Street, Apt 100, New York, New York, 10036. On information and belief he is a white citizen of New York.

50.     On information and belief, defendant, Harry Malakoff (a/k/a Harry Mulakoff) ("Mr. Malakoff") is the receiver of the property referred to as 317 West 45th Street, New York, NY 10036. Mr Malakoff is a New York licensed real estate broker with a principal place of business at 11 Penn Plaza, Apt 2U, New York, NY, 10001.  On information and belief he is a white citizen of New York

51.     On information and belief, and at all times relevant herein, defendant, Angela Saidana ("Ms Saidana") is an employee, officer and/or managing agent of Alan Lapes and/or 317 West 45th Street and/or Alladin Hotel Longacre, LLC and/or 317 Aladdin Hotel Corporation. On information and belief, Ms Saidana resides at an address known to the District Attorney and she is a female of Hispanic descent.

52.     Defendants, 317 West 45th Street; Alladin/Longacre; 317 Aladdin; Mr. Lapes; Mr. Malakoff; and Ms Saidana are collectively referred to herein as "Landlord".

53.     Defendant the City of New York ("NYC" or the "City") is a municipal corporation organized under the laws of the State of New York.  It is responsible for the policies, procedures, and practices implemented through the various agencies, agents, departments, and employees, and for injury occasioned thereby.  It was also the public employer of defendants  Raymond W. Kelly, Brendan Kalkau, "Jane Doe" Martin, Supervisor "John Doe," and Hon. J. Burke.

54.     Defendant the County of New York ("County"), is the primary political subdivision of New York State.  According to the *State of New York Local Government Handbook*, "The county is now a municipal corporation with geographical jurisdiction, homerule powers and fiscal capacity to provide a wide range of services to its residents. To some extent, counties have evolved into a form of 'regional' government that performs specified functions and which encompasses, but does not necessarily supersede, the jurisdiction of the cities, towns and villages within its borders." It was also the public employer of defendants  Robert M. Morgenthau, and Erin Choi,

55.     Defendant, the New York City Police Department (NYPD") is a public entity with its principal offices located in the City and County of New York and its headquarter located at One Police Plaza and situated at Lower Manhattan, New York City.  On information and belief, it is one of the agencies and/or departments under the governorship of NYC and is the employer of law enforcement officials including police officers.

56.     Defendant, Raymond W. Kelly ("Mr. Kelly" or "Commissioner") is a resident of New York and/or maintains his permanent business office in the City and County of New York, and is a duly appointed Police Commissioner of the City and County of New York at all times relevant to this Complaint.  He is and has been responsible for the promulgation and implementation of police policies, procedures, and practices in the City of New York.  In regard to the matters here at issue, defendant Kelly acted at all times as the City's authorized agent, whose actions here at issue were approved in advance and ratified after the fact by the City.  On information and belief he is a white citizen of New York.

57.     Defendant, Brendan  Kalkau ("Kalkau" or "Officer Kalkau") is a resident of New York and/or maintains his permanent business office in the City and County of New York, and is a police officer employed in the New York City Police Department, with Police Officer ID Number 10287 of the 018 Precinct-Midtown North Precinct, at all times relevant to this Amended Complaint He  is and has been responsible for the arrest of plaintiff on or May 14, 2008.  In regard to the matters here at issue, defendant Kalkau acted at all times as the City's authorized agent whose actions here at issue were approved in advance and ratified after the fact by the City.  On information and belief he is a white citizen of New York.

58.     Defendant, "Jane Doe" Martin ("Officer Martin" or "Martin") is a resident of New York and/or maintains her permanent business office in the City and County of New York, and is a police officer employed in the New York City Police Department, with Police Officer ID Number

27702 of the 018 Precinct-Midtown North Precinct, at all times relevant to this Complaint. She is

and has been responsible for the body search of plaintiff in front of Officer "John Doe 1," and other

police officers at the visitors' public area of the 018 precinct on May 14, 2008. On February 29,

2008, Plaintiff filed a complaint against Police Officer Martin with the Civilian Complaint Review

Board (Compl. # 08-0877) following Officer Martin's inappropriate behavior, including threat of

arresting plaintiff during her response to plaintiff's "911 Call". In regard to the matters here at issue,

defendant Martin acted at all times as the City's authorized agent, whose actions here at issue were

approved in advance and ratified after the fact by the City. On information and belief she is a black

citizen of New York and she is of Hispanic descent.

  59. Defendant, Officer "John Doe 1" ("Supervisor 'John Doe' or 'John Doe 1'"")") is a

resident of New York and/or maintains his permanent business office in the City and County of

New York, and is a police officer of unknown rank supervisor of Police Officers Brendan Kalkau

and "Jane Doe" Martin at the 018 Precinct-Midtown North Precinct, at all times relevant to this

Amended Complaint. Upon plaintiff's arrival in handcuff at the precinct on May 14, 2008, Police

Officer "John Doe is and has been responsible for the initial processing of plaintiff after Officer

Martin identified plaintiff to him by specifically stating "here is your subject". In regard to the

matters here at issue, defendant "John Doe" acted at all times as the City's authorized agent, whose

actions here at issue were approved in advance and ratified after the fact by the City. On

information and belief he is a white citizen of New York.

  60. Defendant, Officer "John Doe 2" ("Partner 'John Doe' or 'John Doe 2'"") is a

resident of New York and/or maintains his permanent business office in the City and County of

New York, and is a police officer of unknown rank partner of Police Officers Brendan Kalkau at the

018 Precinct-Midtown North Precinct, at all times relevant to this Complaint. Partner "John Doe"

either escorted plaintiff in handcuff to the police car following her arrest or he was at the patrol car

when Police Office escorted plaintiff to the patrol car and kept her in his custody while he (Officer

Kalkau) returned to plaintiff's room, after seizing her personal belongings, including but not limited

to the keys to her room, her pocket book (hand bag), with all items within, her identification card

("ID"), and her wrist watch. Upon plaintiff's arrival in handcuff at the precinct on May 14, 2008,

Police Officer "John Doe is and has been responsible for the initial processing of plaintiff after

Officer Martin identified plaintiff to him by specifically stating "here is your subject". In regard to

the matters here at issue, defendant "John Doe 2" acted at all times as the City's authorized agent,

whose actions here at issue were approved in advance and ratified after the fact by the City. On

information and belief he is a white citizen of New York.

   61.  At all times relevant to this Amended Complaint, Defendant, Robert M. Morgenthau

is a resident of New York and/or maintains his permanent business office in the City and County of

New York, and is an elected District Attorney ("DA") of New York County (Manhattan), New

York to supervise the day to day operation of criminal prosecutors. He or the current District

Attorney is and has been responsible for the promulgation and implementation of policies,

procedures, and practices of Assistant District Attorneys ("ADA") in the City and County of

New York. The District Attorney's office which operates out of 1 Hogan Place (also known as

100 Centre Street), New York, NY, 10013-4378 is responsible for prosecution of violation of

New York State laws. In regard to the matters here at issue, defendant Morgenthau acted at all

times as the City's authorized agent, whose actions here at issue were approved in advance and

ratified after the fact by the City. On information and belief he is a white citizen of New York.

   62.  Defendant, Erin Choi ("Choi") is a resident of New York and/or maintains his

permanent business office in the City, County and State of New York and is an Assistant District

Attorney employed by the District Attorney to prosecute cases as a representative of the People

of State of New York, at all times relevant to this Amended Complaint. As such he was at all material times responsible for the prosecution of violations of New York state laws. In regard to the matters here at issue, defendant Choi acted at all times as the City's authorized agent, whose actions here at issue were approved in advance and ratified after the fact by the City. On information and belief he is a white citizen of New York and he is of Asian descent.

63.    Defendant, Hon. J. Burke is a resident of New York and/or maintains his permanent business office in the City and County of New York, and is a Judge of the New York City Criminal Court appointed by the Mayor of New York City to provide equal justice to all "citizens" who come before him. As such he is responsible for the implementation of policies, procedures and practices instituted by the Mayor in order to ensure that "all people" are treated with dignity, courtesy, and respect, and to impartially and efficiently administer the criminal laws of New York State. In regard to the matters here at issue, defendant Hon. J. Burke acted at all times as the City's authorized agent, whose actions here at issue were approved in advance and ratified after the fact by the City. On information and belief he is a black citizen of New York and he is of African or Hispanic descent.

64.    All "persons" referred to herein as a defendant are collectively referred to as "Defendants".

<u>FACTUAL ALLEGATION</u>

A.    <u>**Background**</u>

65.    Plaintiff, Joan Ochei's claims in this case arise out of a long and continuing pattern of harassments which include but are not limited to prior police arrest; physical and mental assaults and batteries  by the agents, employees, and/or managers of Ochei's landlord that dates back to 1988. Specifically, these particular claims arise out of an incident on May 14, 2008, involving her

landlord's agent, Ms. Saidana in which Ochei was pushed to the ground and apparently sustained a

bump on her forehead when Ochei went to the management office to report a leaking faucet and no

hot water[1] inside the fourth floor community bathroom.

66.    Due to the traumatic impact of this physical attack and the fall to the ground, Ochei

did not feel the effect of her injury immediately.

67.    However, Ochei received immediate assistance from two individuals who witnessed

this fall and observed the bump on Ochei's forehead.

68.    These two witnesses who are social service workers escorted Ochei to their office

and encouraged Ochei to call 911 for emergency medical service ("EMS") while providing

emotional support by staying with Ochei until the police and EMS personnel arrived.

69.    The police officers arrived inside the social service office where Ochei was sitting

and began questioning Ochei immediately.

70.    Shortly thereafter, the EMS personnel arrived and attempted to interrupt the dialogue

in an effort to administer medical care to Ochei, but Officer Kalkau ordered the EMS to leave the

room.

71.    At a certain point during the short dialogue that lasted less than two minutes, Officer

Kalkau demanded that Ochei show her ID to him which Ochei obliged to by presenting her Federal

Government issued ID to Officer Kalkau.

72.    As Officer Kalkau was about to put Ochei's ID inside his pocket, Ochei politely

informed the officer that she did not like to part with her ID, and then offered to make a photocopy

for the officer.  Ochei offered Officer Kalkau two options; first, for Office Kalkau to hold on to

Ochei's pocket books (hand bags) while Ochei stepped out to copy her ID, or for Officer Kalkau to

---

[1] The faucet has been leaking water for over one year and the hot water inside the 4th floor community
bathroom has been turned off for over three weeks prior to the day of this incident, May 14, 2008.

accompany Ochei to the location where she would make this copy.

73.    Officer Kalkau simply ignored Ochei and put Ochei's ID inside his pocket.

74.    In response to Ochei's question as to why Officer Kalkau seized her ID, the officer announced that he was arresting Ochei.

75.    Astonished by this unexpected announcement, both Ochei and these two social service workers asked Officer Kalkau to explain why Ochei who was injured was being arrested.

76.    Unable to formulate an immediate response, Officer Kalkau stepped out of the social service office leaving Ochei with the two social service workers who later stepped out leaving Ochei alone.

77.    Within 10-15 minutes, Officer Kalkau returned to the social service office, accompanied by the two social service workers and a third social service worker who is of Hispanic descent like Ms. Saidana[2] and informed Ochei that he was placing her under arrest for third degree assault.

78.    When asked to explain the basis for this charge, Officer Kalkau stated that Ms. Saidana claimed that Ochei attacked Ms. Saidana by breaking Ms. Saidana's skin with her nails, and that he, Officer Kalkau observed this broken skin.

79.    As a response to this false allegation, Ochei immediately showed Officer Kalkau her nails and demanded a copy of the surveillance tape that was monitoring the lobby between 7:00 am and the time of police and the EMS arrival at the scene which was approximately 8:00 am.

80.    Officer Kalkau ignored Ochei's request and proceeded to handcuff and seize Ochei's personal belongings which included her wrist watch, cell phone, two pocket books (hand bags), and a folding cart, plus the ID which has already been seized.

---

[2] The two social service workers who witnessed Ochei's fall are black female.

81.    Following the announcement by Officer Kalkau that Ochei was under arrest, the two non-Hispanic social service workers wrote down their telephone number on a piece of paper and handed it to Ochei, but Officer Kalkau quickly seized this telephone number from Ochei.

82.    Before leaving the social service office area, Ochei informed Officer Kalkau that she had some valuable items of up to two thousand Dollars ($2000) inside her pocket book, including cash and her tax refund check, and would like to place all her personal belongings inside her room.

83.    Officer Kalkau denied Ochei's request, instead, Ochei was asked to show the keys to her room to Officer Kalkau who seized them from her.

84.    Shortly after seizing Ochei's keys, Officer Kalkan informed Ochei that he had decided to not take Ochei's personal belongings to the precinct.

85.    After escorting Ochei in handcuff to the police patrol car where she was placed in custody of Officer Kalkau's partner in the patrol car, Officer Kalkau then supposedly returned Ochei's personal belongings to Ochei's room.

86.    The law is clearly established that a valid arrest must be based upon probable cause. Officer Kalkau had neither probable cause to arrest plaintiff nor did he have a warrant to do so.

87.    No reasonable police officer, given the circumstances that preceded plaintiff's arrest, could have concluded that there was probable cause to arrest Ochei.

88.    At no time prior to Officer Kalkau's arrival on the scene or during plaintiff's interactions with Officer Kalkau did plaintiff act violently. On the contrary, Ochei was the victim who was pushed to the ground by her attacker, Ms. Saidana.  Plaintiff also did not threaten anyone verbally or physically or interfere in any way with the officer's investigation.

89.    At no time prior to Officer Kalkau's arrival at the scene or during the interactions with Officer Kalkan did plaintiff use words that by their very utterance inflict injury.

90.    At no time prior to Officer Kalkau's arrival on the scene or during the interactions with Officer Kalkau did plaintiff use words that by their very utterance tend to incite an immediate breach of the peace.

91.    At no time prior to Officer Kalkau's arrival on the scene or during the interactions with Officer Kalkau did plaintiff otherwise behave in a disorderly manner, except to the extent that the officer believed that her spontaneous reaction to the attack to be assault.

92.    Plaintiff was charged with assault without taking any statement regarding the incident prior to her arrest from any unrelated witness, including the security guard on duty, and two eyewitnesses, and without completing the interview with Ochei.  Officer Kalkau stopped questioning Ochei immediately after obtaining Ochei's ID from her.  Officer Kalkau also did not inform Ochei why he was arresting her until the plaintiff and the two eyewitnesses asked the officer.

93.    Defendant, Officer Kalkau made the decision to arrest Ochei without obtaining any substantial information that would warrant an arrest and immediately after Ochei disclosed her ID to him which means that Ochei's arrest was premeditated.

**B.    Events  Between 8:30 AM On May 14, 2008 And Late Afternoon On  May 15 2008**

94.    Upon Ochei's arrival in handcuff at the 18 Precinct, Ochei met Officer Martin standing near the entrance to the precinct as though awaiting Ochei's arrival.

95.    Inside the visitors' public area where Ochei was ordered to stand close to the wall, with her back toward the wall, Officer Martin came and stood in front of Ochei with her back turned toward the police counter where Supervisor "John Doe" was sitting with other police officers. Officer Martin then turned her head and one hand toward these officers and introduced Ochei to these police officers by stating "here is your subject".

96.    Shortly thereafter, Officer Martin put on a pair of gloves and began performing

body search of Ochei by unzipping Ochei's pants, placing her hand inside Ochei's clothes, and patting different areas of her body, including but not limited to her breast at the visitor's public area of the precinct as Supervisor "John Doe", and other police officers and visitors watched.

97.    Ochei was placed inside a cell near the precinct lobby.  After a certain interval, Ochei was interviewed by a civilian personnel who took information relating to Ochei's profile, including but not limited to her highest level of education, employment history and home address.

98.    Shortly thereafter, Ochei was interviewed by Supervisor "John Doe".  During the course of this interview, Ochei was informed that she would be photographed and fingerprinted by Officer Kalkau in preparation for her appearance in front of a judge at the 54th Street Courtroom.

99.    During the course of the fingerprinting which lasted approximately 30-60 minutes, a male individual was placed inside Ochei's cell and she was informed again by Officer Kalkau that she was being fingerprinted in preparation for her appearance in front of a judge at the 54th Street Courtroom.

100.    After the fingerprinting process, Ochei was handcuffed to a bench opposite the cell where this male individual was placed.

101.    From time to time, this male individual repeatedly made all kinds of gestures in order to attract Ochei's attention, including but not limited to asking her questions, screaming out loud without any provocation, and making profane and derogatory remarks.

102.    After an additional 2-3 hours on this handcuffed sitting position, Officer Kalkau, removed Ochei to another cell upstairs where Ochei was interviewed for the third time by another civilian personnel who requested that Ochei sign a piece of paper that was handed to her.

103.    Ochei informed her interviewer that she was unable to read the information on the piece of paper and declined to sign the paper as requested.

104.    Thereupon, Officer Kalkau returned to Ochei's cell and informed Ochei that she

was being taken to 100 Center Street, downtown lower Manhattan, and then proceeded to handcuff and escort Ochei to a waiting patrol car.

105.    While being transported in handcuff to 100 Center Street, Ochei informed the officers inside the patrol car that she was having a severe headache. Ochei was informed that she would receive medical attention at 100 Center Street.

106.    Ochei stood in handcuff for approximately one to two hours while waiting for processing at the 100 Center Street before receiving medical attention by being offered two tablets of Tylenol 650 mg. which was dispensed in a manner that Ochei viewed as inappropriate.

107.    Ochei refused to take the medication for three different reasons: First, Ochei felt that the tablets were contaminated, second 24 hours had passed since Ochei had her last meal before being offered this medication, and thirdly due to fear of excessive bleeding without immediate intervention.

108.    At the 100 Center Street, Ochei was subjected to another processing whereby she was photographed and fingerprinted again. Ochei was also subjected to another body search at this location.

109.    Following this events at 100 Center Street, Ochei was detained and confined further by being placed in a holding cell with a group of about 20 detainees where she remained without any food or drink until around 8:00 am on May 15, 2008.

110.    From the holding cell, Ochei was moved to another holding cell where she remained for another 2-3 hours before appearing in front of the Judge.

111.    After, appearing in front of the Judge, on her way home from the Courthouse, Ochei started to experience symptoms of dizziness and was losing control of her balance. Ochei decided to return to the courthouse and requested emergency medical service.

112.    With the help of officials at the courthouse, Ochei was transported to a nearby hospital where she received medical care until her discharge in late afternoon on May 15, 2008.

113.    Ochei remained without food or drink for approximately forty eight (48) hours between late afternoon on May 13, 2008, and late afternoon on May 15, 2008.

C.    **The Defendants' Action In Prosecuting Ochei Was Based On Malice**

114.    The U.S. Supreme Court has held that the prosecuting attorney's job is to "do justice" just as it is the duty of a U.S. Attorney to do so. As stated by the U.S. Supreme Court,

> "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligations to govern at impartiality is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it should win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. United States, (1934) 295 U.S. 78, 88, 55, S.Ct. 346, ---, 79 L. Ed. 655, ---.

115.    Defendant, Erin Choi, an Assistant District Attorney, Phone: 212-335-4287, acting within the scope of his employment for defendant, the County, along with Angela Saidana, Officer Kalkau, and other law enforcement officers acting in concert, arrested plaintiff without probable cause and then proceeded to institute and continued the criminal proceedings against Ochei with defamatory purpose.

116.    Following Ochei's arraignment on May 15, 2008, defendant Choi instituted criminal proceedings against Ochei by filing the People's Certificate of Readiness with the Complaint sworn and signed by Officer Kalkau and a supporting deposition by Angela Saidana on or about June 3, 2008.

117.    The criminal proceeding terminated in favor of Ochei on November 16, 2009

118.    On May 19, 2009, Ochei orally moved to proceed *pro se* and for a grand jury investigation of the matter relating to her arrest and prosecution.

119.    Following seven adjournments of trial at the prosecution's request, and the expiration of the time for a speedy trial, on November 16, 2009, the prosecution unilaterally moved to dismiss the charge against Ochei for lack of sufficient evidence to prove the charge against her. The Court allowed the prosecution's motion, thereby terminating the criminal proceeding and dismissing the charge against Ochei.

120.    ***Defendant Erin Choi Had No Probable Cause Either To Initiate Or Continue The Criminal Prosecution Proceeding Against Ochei***

> Probable cause to initiate or continue a criminal proceeding is a state of facts in the mind of the accuser "as would lead a man of ordinary caution and prudence to believe or entertain a strong suspicion that the plaintiff committed a crime." *Carroll v. Gillespie*. 14 Mass. App. Ct. 12. 19 (1982); *Conway v. Smerling*. 37 Mass. App. Ct. 1 (1994). That state of mind must be based on reasonable investigation and on reliable evidence. Lack of probable cause may be established by evidence that the investigation was so flawed or superficial that it provided no reasonable basis for thinking the accused could be found guilty beyond a reasonable doubt.

(a)    When Erin Choi Initiated the Criminal Proceeding On Or About June 3, 2008, Erin Choi Had No Probable Cause to Do So

121.    Judged by the above-referenced standards, Erin Choi had absolutely no probable cause to initiate criminal prosecution proceeding against Ochei.

122.    At the time Erin Choi had only a sworn and signed Complaint by Officer Kalkau and a supporting deposition of Angela Saidana.

123.    The criminal proceeding was instituted by Officer Kalkau without probable cause, as the facts observed by him prior to arresting Ochei, and the matters known to him at the time he instituted the criminal proceeding, would not have warranted a reasonable police officer to believe

any criminal offense had been committed by plaintiff.

124.    At Ochei's request, and on information and belief, Ms. Laura Stasior, Ochei's counsel from The Legal Aid Society served a *SUBPOENA DUSES TECUM*, DKT NO: 2008NY036494 *IN THE NAME OF THE PEOPLE OF THE STATE OF NEW YORK TO:* Robert Mendez, 317 West 45th Street, New York, NY 10036, (212) 246-8581 requesting among other things,

> "Any and all photos and video surveillance inside the premises of 317 West 45th Street on May 14, 2008 between the hours of 7:00 a.m. and 10:00 a.m."

125.    Ms. Stasior conducted further investigation by assigning two separate investigators from The Legal Aid Society in June 2008.

126.    On June 6, 2008, an investigator named Sarah Finkelstein, from The Legal Aid Society assigned to Case Number: 98-2008, Docket Number: 2008NY036494 by Attorney Ms. Laura Stasior conducted an investigation by visiting the premise at 317 West 45th Street, New York, NY, 10036, and interviewing different individuals, including but not limited to plaintiff, Joan Ochei and plaintiff's accuser, Angela Saidana.

127.    On June 12, 2008, another investigator named Peter H. Chapman, from The Legal Aid Society assigned to Case Number: 98-2008, Docket Number: 2008NY036494 by Attorney Ms. Laura Stasior conducted another investigation by interviewing different individuals.  Ochei was not interviewed by Mr. Chapman.

128.    Ochei incorporates the attached Exhibits A through C into this Complaint by reference as if set forth herein.

129.    On information and belief, Erin Choi did not ask to view the surveillance tape.

130.    On information and belief, Erin Choi did not interview witnesses, including the security guard on duty during occurrence of event relating to Ochei's arrest and prosecution.

131.    The law is clearly established that an important part of a reasonable investigation would have entailed examination of the source material, but on information and belief, Erin Choi never viewed the surveillance tape nor interview eyewitnesses prior to June 3, 2008, instead Erin Choi filed the People's Certificate of Readiness, then proceeded to repeatedly inform the Court that the "People Are Not Ready", thereby causing seven adjournments of trial before dismissal of the charge against Ochei.

132.    The lack of report from the security guard on duty at the premise during the incident, and Ochei's arrest without a warrant would have prompted a reasonable prudent investigator to look into the reasons for these lack of eyewitness report and raised serious doubts about the validity of the Complaint.  These numerous omissions reasonably support the inference that the Complaint was falsified.

133.    On information and belief, on June 3, 2008, Erin Choi had conducted no investigation sufficient to establish a state of facts in his mind that would lead a man of ordinary caution and prudence to believe or entertain a strong suspicion that Ochei viciously attacked Angela Saidana as described in Officer Kalkau's Complaint.

134.    In short, Erin Choi had no probable cause to initiate criminal proceeding on June 3, 2008.

   (b)    Defendant Erin Choi Had No Probable Cause to Continue the Criminal
          Proceeding After June, 2008

135.    Ochei was arrested without a warrant by Officer Kalkau on May 14, 2008.

136.    On June 6 and 12, 2008, the two investigators from The Legal Aid Society recorded information which eliminated any semblance of probable cause to continue the criminal proceedings (Exhibits B and C).

137.    On information and belief defendant, Erin Choi failed to conduct a reasonable

investigation of the facts relating to Ochei's arrest. If Erin Choi had conducted a reasonable investigation of the facts developed during the interview of eyewitnesses, and reviewed the surveillance tape, he would have discovered all of the above described exculpatory information. That information alone would have convinced a man of ordinary caution and prudence that there was no probable cause to continue the criminal proceedings because there was no reasonable basis for believing that Ochei was capable of such vicious attack as described by Officer Kalkau in his Complaint.

138.    Defendant, Erin Choi decided to conceal all of this exculpatory evidence from the judges to whom he repeatedly informed that the "People Are Not Ready" and requested seven adjournments of trial over a period of eighteen (18) months.

### D.    The City, County and/or State of New York Acting Through Its Agent, Erin Choi Acted With Malice

139.    As plaintiff has emphasized above, malice may be inferred from lack of probable cause.

140.    On information and belief, defendant, Erin Choi has no probable cause to initiate or to continue criminal proceedings against Ochei. On the contrary, his investigation was so cursory, superficial and flawed that it provided no reasonable basis in June 2008, or thereafter for believing that plaintiff was guilty beyond a reasonable doubt of committing assault.

141.    Other factors also indicated that defendant Erin Choi prosecuted Ochei with improper motive.

142.    Defendant, Erin Choi prosecuted the case in such a way as to input guilt for the charge against Ochei in the mind of a reasonable person.

143.    When filing the accusatory complaint against Ochei, aimed as it was at the final decision-makers, defendant, Erin Choi knew and relied on the fact that plaintiff was in the midst

of litigation with her landlord and her employer.

144.    Plaintiff's employer "coincidentally" fired Ochei on the eve of several petitions pursuant to eviction proceedings against Ochei by her landlord.

145.    Defendant, Erin Choi sought to target public and private figures, agencies, and organizations involved in judicial, employment, and disciplinary and/or professional misconduct, including without limitation, judges, past and prospective employers, professional licensing boards who rely on a person's good moral character and conduct in their decision-making procedure.

146.    The Complaint is referenced herein as Exhibit E.  The Complaint as a whole in various specific statement describing Ms. Saidana's injuries, states or implies that Ochei is a vicious attacker.  The complaint is written in such a way that it would induce a reasonable person to deem Ochei capable of violence.

147.    Defendant, Erin Choi's reliance on a transparently fabricated evidence in his prosecution of Ochei was baseless, and placed Ochei in a woefully injurious false and defamatory light.

148.    Defendant, Erin Choi conspired with Officer Kalkau and swore out a false complaint against Ochei and placed her in this false light in reckless disregard of whether his accusation to this effect was true and merely in aid of his collateral purpose to place Ochei in a disadvantageous position in her litigations against her landlord and employers, notwithstanding the devastating consequence of his action for Ochei.

149.    In addition to prosecuting Ochei wrongfully and baselessly, based on false complaint, Erin Choi filed a false statement by Angela Saidana as a SUPPORTING DEPOSITION 100.20 C.P.L. (exhibit D), defamatory in their face and in the context in which they appeared in reckless disregard whether the deposition was true.

150.    On information and belief, at no time prior to the filing of this defamatory complaint did defendant Erin Choi view the surveillance video or seek input from eyewitnesses at the time of Ochei's arrest.

151.    Defendant, Erin Choi's failure to seek input or obtain input from eyewitnesses was magnified by the fact that defendant, Erin Choi requested seven adjournments of trial over a period of eighteen (18) months.

152.    On information and belief, the district attorney's office has a policy of conducting an investigation by gathering evidence and interviewing eyewitnesses at the scene of a crime. In this case, there was no proof that defendant, Erin Choi viewed the subject surveillance video or interviewed unrelated eyewitnesses whose accounts of the incident prior to Ochei's arrest dramatically differ from Officer Kalkau's description of the incident.  But the DA's office imagined or was counseled that a guilty plea by Ochei would help shield it from liability for defamation.  The DA knew or should have known that Officer Kalkau's Complaint was in fact defamatory toward Ochei.

153    Defendant Officer Kalkau's complaint was used in prosecuting Ochei by the DA's office without the DA taking appropriate steps to satisfy itself regarding the accuracy or fairness of defendants, Erin Choi, Officer Kalkau and Angela Saidana's libeling of Ochei.

154.    The DA simply gave Erin Choi free rein to defame Ochei as he saw fit in the eighteen (18) months following Ochei's arrest without requiring him to justify Officer Kalkua's and Angela Saidana's damning allegation.

155.    At the time of criminal proceedings against Ochei, the DA considered itself the county and the city, 's only prosecutors of criminal defenders, and was generally recognized as the most prominent influential prosecutors in the country.

156.    The initiation of criminal proceedings against Ochei by defendant, Erin Choi with its

intended purpose to defame Ochei among other things, gave rise to severe notoriety gravely injurious to Ochei.  The injury to Ochei's reputation was all the more severe given the status and prosecutory clout of the DA.

157.    Defendant Erin Choi knowingly and recklessly traded off Ochei's good name in return for his, Erin Choi's private aggrandizement as the one who showed Ochei's vicious and dangerous character.  This defamatory trade-off accomplished in derogation of Erin Choi's elementary obligations of professionalism and fairness as a prosecutor, was malicious, willful, and oppressive to Ochei's great detriment.  Defendant Erin Choi intentional, knowing, and cynical public campaign of subordinating Ochei's name, reputation and well being to his Erin Choi's private vigilante agenda was calculated to inflict severe emotional distress upon Ochei, which it did

158.    Defendants, the State, County and City of New York and the DA, Robert M. Morgenthau knowingly and recklessly suffered defendant Erin Choi repeatedly to compel Ochei to appear in front of the judges, and to defend against a crime she did not commit without regard to the truth or falsity of the complaint and deposition filed in the criminal court.

159.    All of these factual misrepresentations by defendant Erin Choi coupled with his hasty filing of the false complaint by Officer Kalkau and deposition by Angela Saidana create an undeniable inference that Erin Choi was excessively eager to advance his personal position at the DA's office by initiating and filing The People's Certificate of Readiness and pursuing criminal proceeding without reasonable investigation of the facts and motivated by improper purpose.

E.    **The Court Denied Plaintiff a Fair and Speedy Trial**

160.    Following her arraignment on May, 15, 2008, Ochei made additional seven appearances in front of the judges before the charge against her was finally dismissed on November 16, 2009.

161.    During most of Ochei's visits to the Criminal Courthouse in 2008, Ochei had to wait approximately 6-8 hours before appearing in front of the judges. Ochei's court appointed counsel, Ms. Laura Stasior was never present in Court when Ochei appeared in front of the judges, except on May 15, 2008.

162.    Even though Ochei's counsel was never present in court during her appearances in front of the judges, Ochei was never allowed to speak, except when asked by the judges whether she would accept the ADAs' plea bargain offers and plead guilty to a violation.

163.    On each of her visit to the Criminal Courthouse in 2008, Ochei repeatedly asked questions to determine if her Court appointed counsel would appear in front of the judges with her and she was always assured that her lawyer would be there, but that never happened.

164.    Subsequent to each court visit that Ochei's counsel failed to appear in front of the judge with her, Ochei would always contact her counsel to inquire as to why her counsel failed to appear in court.

165.    To her disappointment and frustration, Ochei never received any satisfactory answer from her counsel regarding this matter.

166.    Due to all these conflictive and sometimes confusing issues, Ochei not only felt unjustly prosecuted, but she also felt persecuted and oppressed by the system.

167.    Finally, Ochei decided to take the matter one step further by filing complaints with the FBI, the Congressman, and the Public Advocate. But Ochei did not receive any response from any of these agencies or agents. Ochei also requested a meeting with her counsel and she was granted a meeting.

168.    During Ochei's meeting with her counsel in November 2008, Ochei requested copies of her file and she also expressed her wish to seek another counsel or proceed *pro se*.

169.    In response to Ochei's request, Ochei's counsel informed her that due to recent

changes in her schedule, she would be able to devote more time to Ochei's case.

170.    In December 2008, one week after holding a meeting with Ochei and one day after asking Ochei to decide whether or not she wanted to continue the attorney/client relationship with her counsel, Ochei received an email from her counsel informing Ochei that the judge had assigned her case to another attorney.

171.    Ochei initially reacted to this unexpected change by unsuccessfully requesting a new counsel through The Legal Aid Society before contacting the Office of Criminal Court Clerk to request information on how to proceed as *pro se* defendant.  Ochei was advised to make an oral motion during her next appearance in front of the judge.

172.    Ochei's initial apprehension with regard to this change quickly disappeared after she received copies of her file from her new Court appointed counsel who later conducted a detailed interview with Ochei before her next court appearance on January 14, 2009.

173.    After being contacted by an investigator assigned to Ochei's case by her new counsel, Ochei expressed her disapproval of this late hour investigation to both her counsel and this investigator by informing them of her belief that this investigation would not yield any substantive result, especially after the Legal Aid Society investigators had already conducted earlier investigations and subsequently served the landlord with *subpoena duses tecum* to compel Ochei's landlord to deliver a copy of the surveillance video monitoring the lobby of her building during the incident prior to Ochei's arrest.

174.    On the following dates: January 14, 2009, March 17, 2009, and May 19, 2009, Ochei appeared in front of the Judges with her new court appointed counsel. But the Court continued to exclude Ochei from making any statement in front of the Judges.  Even a plea of not guilty was entered by her counsel while Ochei stood silently beside him without being addressed by the Court.

175.    After yet another adjournment to September 10, 2009, Ochei had a discussion with her counsel in which she informed her counsel that she would like to appear in front of the Judge again to request that the Judge relieve the counsel from her case.

176.    On her second appearance in front of the Hon. J. Burke on May 19, 2009, in addition to her oral motion to proceed *pro se*, Ochei also made a motion for a grand jury investigation of her case.

177.    Both motions were apparently denied or ignored by the Hon. J. Burke.

178.    Based on the Hon. J. Burke's response to Ochei's motions and the subsequent representation of Ochei on September 10, 2009, by the same counsel whom Ochei asked the Hon. J. Burke to relieve from her case, it became clear to Ochei that her motions on May 19, 2009, was either denied or ignored.

179.    After appearing in front of another judge with her counsel on September 10, 2009, Ochei informed her counsel that she was going to file a motion to dismiss, and also commence a civil action in connection with this matter.

180.    On her last court appearance on November 16, 2009, without an attorney, Ochei appeared in front of the Hon. J. Burke who informed her that the charge against her has been dismissed.

181.    The arrest, ensuing incarceration, and defense of invalid charge caused economic, physical, and emotional damages for which Ochei is entitled to be compensated

**F.    Ochei's Landlord**

182.    Since 2004, Ochei began noticing a pattern of unlawful conduct by her landlord that were similar to the pattern of illegal eviction tactic engaged in by her landlord during the period between 1988 and around 1996.

183.    During this above-mentioned period, Ochei's landlord engaged in a series of

terrorist eviction activities in the following manner:

    (a)    by illegally breaking into Ochei's room and stealing her personal properties,

    (b)    by illegally planting thugs masquerading as tenants to terrorize Ochei by among other things blocking Ochei's movement along the hallway with huge cart, and physically attacking her,

    (c)    by illegally instigating the police not to arrest Ochei's attackers.  On the day of, Ochei's attack by a group of about ten of these so called tenants, police ordered these people to enter into the rooms opposite ochei's room and refused to question them following Ochei's report of the incident that prompted the 911 call,

    (d)    by illegally instigating a tenant named Shirley Peck to make a false claim of assault against Ochei with regard to an incident in which Ochei was assaulted by this lady who threw hot water at Ochei and hit her with a pot when Ochei answered her door to address this lady's claim that the sound from Ochei's clock radio in Room 420 was disturbing Shirley Peck in Room 407,

    (e)    by illegally instigating the police to falsify evidence in order to arrest Ochei. Upon arriving in front of Ochei's door, with Shirley Peck standing there with the pot that she hit Ochei with still in her hand, the police instructed her to state that the pot actually belonged to Ochei, and then proceeded to arrest Ochei by charging her with assault and illegal possession of weapon on account of the pot that was taken from Shirley Peck,

    (f)    by illegally conspiring with the police to arrest Ochei.  Following Ochei's arrest in connection with the above-mentioned incident, Ochei was kept in police custody for nearly 48 hours and subsequently made several court appearances

before the charges against her was finally dismissed,

(g) by illegally breaking down Ochei's door and removing all of her personal property inside her room while she was in police custody following her arrest,

(h) by illegally allowing strange men and police officers to come and be knocking at Ochei's door in the middle of the night,

(i) by placing numerous false eviction notices in front of Ochei's door, thereby, compelling Ochei to go to the housing court on numerous occasions to answer these non-existent eviction proceedings,

(j) by commencing frivolous eviction proceeding against Ochei thereby requiring Ochei to make numerous court appearances before the case was dismiss in the housing court,

(k) by illegally converting the public toilet system in the community hallway to private toilet system, thereby causing constant clogging of the toilet bowls and flooding in the hallway, and

(l) by illegally dismantling the public kitchen in the hallway and sealing the janitor's door thus preventing access to the kitchen and janitor's sink next to the kitchen.

184. Similar to the events between 1988 and 1996, in or about 2004, Ochei's landlord began another pattern of terrorist eviction activities against Ochei.

185. In or about 2004, Ochei's landlord returned a check that she paid her rent with and demanded that Ochei address the check to Alladin Hotel instead of Longacre Hotel as Ochei had done for nearly twenty years.

186. Ochei responded by requesting a legal notice of change of ownership of the building which her landlord failed to provide. Instead, Ochei's landlord started rejecting rent payments from Ochei.

187.    Beginning around 2006, Ochei started seeing a lot of unfamiliar faces on the fourth floor.

188.    Ochei also started noticing that some of these people were actually targeting her by deliberating occupying the bathrooms to delay Ochei's access to the bathrooms for approximately 30-60 minutes.  When Ochei finally got inside the bathroom, these people would come and be knocking at the bathroom door.  While these harassments were going on, Ochei discovered that the locks to the bathroom doors were defective and unsafe.

189.    Less than one month after being fired from her job, the harassment against Ochei escalated to a new level.

190.    Between 2005 and 2007, Ochei made several complaints to her landlord regarding damages to her furniture caused by excessive steam that was gushing from the radiator.  Ochei's complaint was totally ignored.

191.    After this damage started extending to the units below Ochei's room, her landlord started accusing Ochei of causing damages to the building and then began serving Ochei with false eviction notices through their attorney, Offer Waide of Rattner & Waide, 26 Broadway, 21st Floor, New York, NY, 10004.

192.    In 2008, Ochei's landlord through their attorney Offer Waide, served Ochei with four separate petitions as listed below:

    (i)    1/24/2008    Ten (10) Day Notice to Cure,

    (ii)   2/25/2008    Ten (10) Day Notice of Termination,

    (iii)  5/28/2008    Hold-Over Dwelling: L&T Index No. 69181/08,

    (vi)   11/13/2008   Five (5) Day Demand Notice for "RENT OWED" January 2004
                        through November 2008,